**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY J. PELLICCIA, | : | CIVIL NO.: 1:24-cv-00428 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LELAND DUDEK, [1] | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**I. Introduction.**

    In this social security action, Plaintiff Anthony J. Pelliccia seeks judicial

review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for disability insurance benefits under Title II

of the Social Security Act. We have jurisdiction under 42 U.S.C. §§ 405(g). For

---

    [1] Leland Dudek is now the Acting Commissioner of Social Security, and he
is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P.
25(d) (providing that when a public officer sued in his or her official capacity
ceases to hold office while the action is pending, "[t]he officer's successor is
automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted
in accordance with this subsection shall survive notwithstanding any change in the
person occupying the office of Commissioner of Social Security or any vacancy in
such office.").

the reasons set forth below, we will affirm the Commissioner's decision and enter judgment in favor of the Commissioner.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 12-1* to *12-7.*[2]  On May 20, 2020, Pelliccia filed an application for disability insurance benefits, alleging that he has been disabled since August 17, 2016. *See Admin. Tr.* at 305–310.  After the Commissioner denied his claims at the initial and reconsideration levels of administrative review, *id.* at 108–119, 121–132, Pelliccia requested an administrative hearing, *id.* at 133–34.  In October 2022, Pelliccia— who was represented by counsel[3]—as well as a vocational expert testified at a hearing before Administrative Law Judge Vincent Cascio (the "ALJ"). *Id.* at 35– 58.  In February 2023, the ALJ denied Pelliccia's claim for benefits. *Id.* at 14–34. Pelliccia appealed the ALJ's decision to the Appeals Council, which denied his request for review. *Id.* at 1–6.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Pelliccia's claim.

[3] Two prior telephonic hearings were continued so that Pelliccia could obtain counsel. *Admin. Tr.* at 59–77.

In March 2024, Pelliccia, represented by counsel, began this action by filing a complaint seeking review of the Commissioner's decision denying his claim. *See Doc. 1*. He requests that the court find that he is entitled to benefits or remand the case for a further hearing. *Id*. at 2 (Wherefore Clause). He also seeks attorney's fees and "such further relief as the Court deems just and proper." *Id*.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 10*. The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 11, 12*. The parties filed briefs, *see docs. 15, 17, 18*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103. Substantial evidence "means—

3

and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Pelliccia is disabled, but whether substantial evidence supports the Commissioner's finding that he is not disabled and whether the Commissioner correctly applied the relevant law.

## B. Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4]

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a). Under this process, the

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)). "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id.* (citing 42 U.S.C. § 416(i)(2)). Here, the ALJ determined that Pelliccia met the insured-status requirements through June 30, 2022. *Admin. Tr.* at 19.

ALJ must sequentially determine: (1) whether the claimant is engaged in

substantial gainful activity; (2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals a listed impairment;

(4) whether the claimant is able to do his or her past relevant work; and

(5) whether the claimant is able to do any other work, considering his or her age,

education, work experience, and residual functional capacity ("RFC"). 20 C.F.R.

§ 404.1520(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of

Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an

individual is still able to do despite the limitations caused by his or her

impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)

(quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20

C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ considers all the

claimant's medically determinable impairments, including any non-severe

impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R.

§ 404.1545(a)(2).

"The claimant bears the burden of proof at steps one through four" of the

sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d

Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner,

who must . . . show there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical

impairments, age, education, past work experience, and residual functional

capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive

requisites.  Most significantly, the ALJ must provide "a clear and satisfactory

explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642

F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which

evidence he has rejected and which he is relying on as the basis for his finding."

*Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The

"ALJ may not reject pertinent or probative evidence without explanation." *Johnson*

*v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the

reviewing court cannot tell if significant probative evidence was not credited or

simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On February 9, 2023, the ALJ denied Pelliccia's claim for benefits. *Admin.*

*Tr.* at 17–28.  He proceeded through the five-step sequential-evaluation process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Pelliccia had not engaged in substantial gainful activity since his alleged onset date of August 17, 2016, through his date last insured of June 30, 2022. *Id.* at 20.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Pelliccia had the following severe impairments: degenerative disc disease of the cervical spine, left shoulder derangement, and left biceps tendon rupture. *Id*. Pelliccia had some treatment for left knee pain, but the ALJ concluded that prior to the date last insured, Pelliccia's knee impairment was not severe. *Id*.  The ALJ further concluded that although Pelliccia alleged disability due to mental impairments, such impairments were not severe. *Id*. at 20–21.[5]

### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that Pelliccia did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

---

[5] Because Pelliccia does not raise any issues about how the ALJ analyzed his mental impairments, we will not further mention those mental impairments, including when summarizing the rest of the ALJ's decision.

1. *Id.* at 21–22.  Specifically, the ALJ considered Listings 1.18 (Abnormality of a major joint in any extremity) and 1.15 (Disorders of the skeletal spine).  *Id.*

### D.  The RFC.

The ALJ then determined that Pelliccia had the RFC to do light work[6] with some limitations.  *Id.* at 22.  He concluded that Pelliccia could not climb ropes, ladders, or scaffolds; could not crawl; and must avoid unprotected heights and hazardous machinery.  *Id.*  He also concluded that Pelliccia could only occasionally climb ramps and stairs, only occasionally stoop, crouch, and kneel, and only occasionally "reach, including overhead reaching, with the left upper extremity."  *Id.*

In making this RFC assessment, the ALJ noted that Pelliccia "is a 46-year-old individual alleging disability since August 2016 primarily due to work related

---

[6] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.").

injuries of the left arm/shoulder and neck." *Id*.[7]   The ALJ concluded that although

Pelliccia's impairments "could reasonably be expected to cause the alleged

symptoms[,]" his "statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and

other evidence in the record for the reasons explained in this decision." *Id*.

In making the RFC assessment, the ALJ also summarized Pelliccia's

medical records and treatment notes. *Id*. at 22–24.  He began by summarizing the

records following Pelliccia's fall off a ladder at work in August 2016, noting that

"[a]n examination of the left arm showed obvious retraction of the distal biceps

tendon, with marked tenderness," and that Pelliccia "exhibited pain with any

motion of the left wrist and forearm." *Id*. at 22.  "An x-ray showed no fractures of

the arm." *Id*. at 22–23.  Pelliccia "subsequently underwent repair of the left biceps

tendon on August 26, 2016." *Id*. at 23.  "Post-operatively, [Pelliccia]'s arm and

elbow were braced, and he was engaged in a course of physical therapy to improve

strength and range of motion." *Id*.

The ALJ then noted that Pelliccia began to complain of cervical symptoms

and he obtained testing and treatment for those symptoms:

> . . . as of February 2017, [Pelliccia] began to report increased
> cervical and left trapezius and scapular pain, with signs of

---

[7] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to the record.

decreased strength of the left hand and shoulder and diminished
cervical range of motion.  He reported numbness and tingling in
the left hand and fingers.  [Pelliccia] was also noted to have left
elbow discomfort and painful clicking with extension.
[Pelliccia] subsequently received physical therapy for his
cervical condition, as well.

An MRI of the cervical spine in March 2017 showed evidence
of mild endplate fractures at C6 and C7, spondylosis at C5-6
and C6-7 with mild disc cord compression, and multilevel disc
herniation at C5-6 and C6-7.

[Pelliccia] was seen for a Workers' Compensation IME in April
2017.  [He] was noted to have intact motor strength in the left
upper extremity with minimal tenderness and no muscle
atrophy, though there were some sensory deficits in the left
forearm and fingers.  Range of motion of the cervical spine was
diminished, as was motion of the left elbow.  A subsequent
IME in August 2017 was grossly unchanged.

Examinations from August 2017 through early 2018 continued
to note reports of pain in the left shoulder and elbow and pain in
the cervical region.  [Pelliccia]'s range of motion remained
limited with spasms of the cervical muscles.  [Pelliccia] also
exhibited signs of left hand tremors and weakness in the left
upper extremity

[Pelliccia] attended a neurosurgical consultation in December
2017 and January 2018 due to ongoing pain in the neck and left
arm.  He was noted to have decreased cervical range of motion,
positive Spurling's on the left, tremors in the left upper
extremity/hands, and diffuse weakness of the upper extremity.

[Pelliccia] also attended an IME in January 2018.  An
examination noted decreased range of motion of the cervical
spine and left elbow.  There was also decreased grip strength
and sensation in the left hand.

*Id*.

"On February 23, 2018 [Pelliccia] underwent an anterior cervical

discectomy and fusion . . . at C5-6 and C6-7." *Id*. The ALJ noted that "[p]ost-

operatively, [Pelliccia] was engaged in physical therapy, and reported increased

endurance and ability to perform daily activities." *Id*. And "[t]hough he showed

some residual signs of decreased range of motion of the cervical spine,

examinations noted intact sensation and motor function, and intact reflexes,

indicating resolution of his cervical radiculopathy." *Id*. The ALJ also observed

that "[a] Workers' Compensation IME in November 2018 noted [Pelliccia] was

stiff and did not move his neck much, with some deficits in cervical range of

motion, left shoulder range of motion, and left elbow range of motion; however, a

motor and sensory examination was normal." *Id*. at 24.

While noting that Pelliccia still had some symptoms, the ALJ concluded that

Pelliccia had generally improved after his cervical surgery and his treatment

thereafter was minimal and conservative:

> Thus, since [Pelliccia]'s surgery the record has reflected general
> improvement in [Pelliccia]'s symptoms of neck and left upper
> extremity pain and radicular signs. His treatment has been
> minimal and conservative. An EMG/nerve conduction study in
> July 2019 did note some residual left C5-6 radiculopathy, and
> an examination in August 2022 noted some decreased C6 and
> C7 sensation with cervical tenderness. However, this exam
> indicated intact range of motion of the cervical spine, intact
> motor strength in the upper extremities, normal reflexes, and
> negative Spurling's sign. A consultative examination in August
> 2020 also noted significantly decreased cervical range of
> motion and limited left shoulder elevation and abduction, but

his motor strength and sensation were intact, as were grip strength and hand/finger dexterity. [Pelliccia] engaged in a subsequent course of physical therapy for his neck pain in late 2022, as well as chiropractic care; however, there is no evidence of any other aggressive treatment or recommendation for further surgical intervention since 2018.

*Id.*

The ALJ also concluded that Pelliccia "described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.* Specifically, the ALJ noted that Pelliccia "testified that he is able to drive a car." *Id.* According to the ALJ, "[t]he ability to drive demonstrates concentration and persistence as well as an ability to deal with the stress inherent in the operation of a motor vehicle, attributes necessary to work effectively." *Id.* "Driving also shows the ability to use hand and foot controls, an ability to turn one's head to consult mirrors and to back up and change lanes, and to sit for continuous period of time." *Id.* And, the ALJ continued, "[i]t further demonstrates the ability to bend and stoop to get into and out of a car." *Id.* The ALJ also noted that Pelliccia reported that "he is able to attend to his own self-care and grooming[,]" that "[h]e can go grocery shopping[,]" that "[h]e does some cleaning, laundry, and other chores around the home[,]" that "[h]e can cook and prepare food on his own[,]" and that "he feels better when he is up and moving around." *Id.*

And the ALJ considered the medical opinion evidence and prior administrative medical findings in the record. *Id.* at 24–26.  The ALJ found the opinion of Dr. Soyer that Pelliccia could not lift[8] over ten pounds to be "generally unpersuasive, as it was rendered prior to [Pelliccia]'s spinal surgery and therefore does not take into account the improvement in functioning noted in the post-operative records or minimal treatment/abnormal findings thereafter." *Id.*

The ALJ then considered the opinion of consultative examiner Dr. Mercurio, who "opined that [Pelliccia] had mild limitation for prolonged sitting or walking; mild limitation for repetitive climbing stairs; and marked limitation for bending, lifting, carrying, kneeling, or reaching with his left arm." *Id.* at 24–25.  The ALJ found Dr. Mercurio's opinion "consistent with Dr. Mercurio's findings, which noted significant deficits in [Pelliccia]'s range of motion of the cervical spine and left shoulder during the exam." *Id.* at 25.  But the ALJ concluded that "these findings are not entirely consistent with the minimal and conservative treatment records from [Pelliccia]'s own physicians since 2018, as noted above." *Id.*  Thus, the ALJ concluded that Dr. Mercuio's "opinion is only partially persuasive." *Id.*

---

[8] Dr. Soyer opined that Pelliccia could not lift greater than 10 pounds. *Admin. Tr.* at 601.  But, as a result of what appears to be a typographical error, the ALJ incorrectly states in his decision that "Dr. Soyer opined that the claimant could lift over 10 pounds." *Id.* at 24.  From the context of the decision, however, it appears that the ALJ recognized that Dr. Soyer opined that Pelliccia could **not** lift over ten pounds.

The ALJ also found the statements and opinions made in connection with

Pelliccia's worker's compensation claim "neither valuable nor persuasive":

> The undersigned notes numerous statements throughout the
> record regarding [Pelliccia]'s temporary to permanent status of
> disability, his ability to return to work, and/or his disability
> rating/loss of use rating.  The undersigned finds such statements
> neither valuable nor persuasive. These statements and disability
> ratings were rendered in connection with [Pelliccia]'s claim
> under Workers' Compensation law, . . . which is a different
> program with different standards of assessing disability, and is
> not binding on the undersigned in rendering the decision herein.
> Moreover, such statements are issues reserved to the
> Commissioner pursuant to 20 CFR 404.1520b(c), [and] thus do
> not have probative value as medical opinions.  To the extent
> that Sukdeb Datta, M.D.['s] opinions which were rendered for
> purposes of Workers Compensation provide a function by
> function analysis, they are not persuasive.  Since [Pelliccia]'s
> surgery the record has reflected general improvement in
> [Pelliccia]'s symptoms of neck and left upper extremity pain
> and radicular signs.  His treatment has been minimal and
> conservative.  Exams indicated intact range of motion of the
> cervical spine, intact motor strength in the upper extremities,
> normal reflexes, and negative Spurling's sign.  A consultative
> examination in August 2020 also noted his motor strength and
> sensation were intact, as were grip strength and hand/finger
> dexterity.  [Pelliccia] engaged in a subsequent course of
> physical therapy for his neck pain in late 2022, as well as
> chiropractic care; however, there is no evidence of any other
> aggressive treatment or recommendation for further surgical
> intervention since 2018.

*Id*.

The ALJ also considered the opinions and findings of the state agency

medical consultant Dr. Rosenthal, who found that Pelliccia could perform the full

range of light work. *Id*. at 26.  The ALJ concluded that Dr. Rosenthal's findings

"are partially persuasive, as they are generally consistent with [Pelliccia's] injuries and subsequent treatment, including surgery to repair his biceps tendon and cervical fusion." *Id*. But "in considering the later submitted medical records, including the recent examinations showing continued deficits in range of motion and nerve conduction studies showing ongoing radiculopathy," the ALJ concluded that "additional postural and manipulative limitations [are] warranted by [Pelliccia]'s history and expanded record." *Id*.

The ALJ asserted that his conclusion that Pelliccia has the RFC to perform light work with limitations "is appropriate and supported by the totality of the medical evidence, the medical opinions, and the subjective statements of [Pelliccia]." *Id*. In summary, the ALJ stated that "[i]n considering [Pelliccia]'s injuries sustained in August 2016 through the date last insured, the undersigned finds that [Pelliccia] was able to perform a range of light . . . work consistent with the above residual functional capacity." *Id*.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Pelliccia could not perform his past relevant work as an iron worker. *Id*. at 26.

16

**F.  Step Five.**

At step five of the sequential-evaluation process, considering Pelliccia's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as rental clerk, usher, and host—that exist in significant numbers in the national economy that Pelliccia could perform. *Id.* at 27.

In sum, the ALJ concluded that Pelliccia was not disabled from August 17, 2016 (which is the alleged onset date), through June 30, 2022 (which is the date last insured). *Id.* at 28.  Thus, he denied Pelliccia's claim for benefits. *Id.*

**V.  Discussion.**

In his opening brief, Pelliccia presents one claim: "The ALJ's RFC[] is unsupported by substantial evidence and a product of legal error because the ALJ improperly evaluated the opinion evidence." *Doc. 15* at 3 (bold omitted).[9]

---

[9] Pelliccia raises additional claims in his reply brief.  But the local rules of court require that the plaintiff's opening brief in a social security action include, among other things, a statement of errors setting "forth in separate numbered paragraphs the specific errors committed at the administrative level which entitle plaintiff to relief[,]" and an argument that is "divided into sections separately addressing each issue" and that "set[s] forth the contentions of plaintiff with respect to each issue and the reasons therefor." M.D. Pa. L.R. 83.40.4(b), 83.40.4(c).  "A reply brief is not the appropriate forum in which to raise new issues and the court need not address issues raised for the first time therein." *Bell v. Lackawanna Cty.*, 892 F. Supp. 2d 647, 688 n.41 (M.D. Pa. 2012).  Thus, "[i]n Social Security cases, all arguments raised must be clearly presented in a

Specifically, Pelliccia contends that the ALJ improperly evaluated the opinions of Dr. Mercurio. *Id*. at 4–9. Before we address Pelliccia's specific arguments regarding the ALJ's evaluation of Dr. Mercurio's opinions, we set forth the standards regarding the RFC assessment in general as well as a brief overview of the regulations regarding opinion evidence.

### A. The RFC.

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting *Hartranft*, 181 F.3d at 359 n.1). In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121. "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066). The court's "review of the ALJ's assessment of the

---

claimant's statement of errors, and new arguments should not be raised for the first time in a reply brief." *Izalia V. v. O'Malley*, No. 4:22-CV-1819, 2024 WL 4505469, at *7 n.43 (M.D. Pa. Oct. 16, 2024). Here, we will consider only the claims raised in Pelliccia's opening brief; we will not consider claims raised for the first time in his reply brief.

plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, 1:20-CV-492, 2021 WL 4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's] residual functional capacity with the deference required of the substantial evidence standard of review.").

Further, "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).  And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009).  In fact, in evaluating the medical opinion evidence of record, "the ALJ is not only entitled but required to choose between" conflicting medical opinions. *Cotter,* 642 F.2d at 705.

In setting the RFC, the ALJ must also clearly articulate his or her reasoning. In other words, the ALJ must "set forth the reasons for his decision" to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119 (citing *Cotter*, 642 F.2d at 704–05).  Although an ALJ need not "use particular language or adhere to a particular format in conducting his analysis," the ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  The ALJ's decision

must set out "a clear and satisfactory explication of the basis on which it rests."
*Cotter*, 642 F.2d at 704. If an ALJ "has not sufficiently explained" how he or she
considered all the evidence "'to say that [the] decision is supported by substantial
evidence approaches an abdication of the court's duty to scrutinize the record as a
whole to determine whether the conclusions reached are rational.'" *Dantzler v.
Saul*, No. 3:16-CV-2107, 2019 WL 5569466, at *1 (M.D. Pa. Oct. 28, 2019)
(quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)).

### B. Opinion Evidence.

The regulations regarding the evaluation of opinion evidence are different
for claims filed before March 27, 2017 ("old regulations"), on the one hand, and
for claims, like Pelliccia's, filed on or after March 27, 2017 ("new regulations"),
on the other hand. The new regulations applicable here have been described as a
"paradigm shift" in the way medical opinions are evaluated. *Mercado v. Kijakazi*,
629 F. Supp. 3d 260, 279 (M.D. Pa. 2022). Under the old regulations, "ALJs were
required to follow regulations which defined medical opinions narrowly and
created a hierarchy of medical source opinions with treating sources at the apex of
this hierarchy." *Id*. at 280. But under the new regulations, "[t]he range of opinions
that ALJs were enjoined to consider were broadened substantially, and the

approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis." *Id*.

Further, under the old regulations, the ALJ assigns the weight he or she gives to a medical opinion. 20 C.F.R. §§ 404.1527(c), 416.967(c). Under the new regulations, however, the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ must explain how he or she "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in" his or her determination or decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may, but is not required to, explain how he or she considered the remaining three factors in determining the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). But if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

Supportability and consistency are defined in 20 C.F.R. §§ 404.1520c(c), 416.920c(c). As the regulations provide, supportability means: "The more relevant

the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Commissioner of Social Security*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021*), adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022).  On the other hand, consistency means: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The consistency factor focuses on "how well a medical source is supported, or not supported, by the entire record." *Acosta Cuevas*, 2021 WL 363682, at *10.

## C.  The ALJ's Evaluation of Dr. Mercurio's Opinions.

With the above standards in mind, we address the ALJ's consideration of Dr. Mercurio's opinions.  Dr. Mercurio opined that Pelliccia had no limitations in certain areas, that he had mild limitations in other areas, and, as relevant here, that

he had "marked limitation for bending, lifting, carrying, or kneeling," as well as "marked limitation for reaching with his left arm." *Admin. Tr.* at 701.  As set forth above, the ALJ found the opinions of Dr. Mercurio's only partially persuasive. *Id.* at 25.  The ALJ found Dr. Mercurio's opinion "consistent with Dr. Mercurio's findings, which noted significant deficits in the claimant's range of motion of the cervical spine and left shoulder during the exam." *Id.*  But the ALJ concluded that "these findings are not entirely consistent with the minimal and conservative treatment records from [Pelliccia]'s own physicians since 2018, as noted above." *Id.*

At the outset, we note that at places in his brief, Pelliccia contends that the ALJ failed to properly address both the supportability and consistency of Dr. Mercurio's opinions. *See doc. 15* at 6.  But later, recognizing that "[s]upportability is an internal check that references objective medical evidence and supporting explanations that come from the source itself[,]" Pelliccia acknowledges that "the ALJ's statement regarding the consistency between Dr. Mercurio's findings and his opinion addresses the required supportablity factor." *Id.* at 6–7.  Pelliccia contends, however, that "the ALJ failed to explain whether or not Dr. Mercurio's findings were also supported by relevant objective evidence" and he contends that the ALJ's consistency analysis was flawed. *Id.* at 7.  Thus, we conclude that Pelliccia is complaining about the ALJ's analysis of the consistency factor.

Pelliccia contends that "the ALJ not only failed to consider any nonmedical sources, but he erroneously based his assessment upon the limited scope of the minimal and conservative treatment since 2018 versus the relevant record as a whole beginning at Plaintiff's alleged onset date of August 17, 2016." *Doc. 15* at 7–8. Pelliccia also contends that the ALJ "failed to provide an actual explanation describing how the evidence led to his conclusions." *Id*. at 8. In this latter regard, he asserts that "the ALJ directly referenced some of Dr. Mercurio's findings, but then essentially invalidated them based on evidence 'as noted above' without actually citing to or specifying what evidence led him to his conclusion." *Id*.

As noted above, the ALJ must set forth reasons for his or her decision. *Burnett*, 220 F.3d at 119. But the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis. *Jones*, 364 F.3d at 505. Rather, the "ALJ is merely required 'to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.'" *Watters ex rel. L.B. v. Colvin*, No. 3:13-CV-770, 2014 WL 1268566, at *6 (M.D. Pa. Mar. 26, 2014) (quoting *Jones*, 364 F.3d at 505). The ALJ must explain the dispositive reasons for his or her decision. *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024). And the ALJ's decision must be read as whole. *Jones*, 364 F.3d at 505.

Here, when viewing the ALJ's decision as whole, we conclude that the ALJ
sufficiently addressed why he found Dr. Mercurio's opinions only partially
persuasive.  First, Pelliccia contends that when considering Dr. Mercurio's
opinions, ALJ failed consider any nonmedical sources.  But the ALJ did consider
Pelliccia's testimony and contentions, *see Admin*. Tr. at 22–24, and Pelliccia does
not specify any other non-medical sources that the ALJ should have—but failed—
to consider.

Next, Pelliccia complains that when addressing Dr. Mercurio's opinions, the
ALJ focused on treatment since 2018 instead of the entire period since his alleged
onset date of August 17, 2016.  But Dr. Mercurio rendered his opinions on August
28, 2020, *see Admin. Tr*. at 697 (report dated Aug. 28, 2020), which was
approximately two-and-a-half years after Pelliccia's cervical surgery on February
23, 2018, *see id*. at 543–547 (surgical report dated Feb. 23, 2018).  Further, Dr.
Mercurio acknowledged that Pelliccia had surgery on his neck in 2018, *see id.* at
697, and he based his opinions on Pelliccia's condition at the time of his report, *see
id*. at 700 (stating opinions "based on today's physical exam").  Thus, it was
reasonable for the ALJ to focus on Pelliccia's treatment since 2018 when
evaluating Dr. Mercurio's opinions.

Pelliccia's main complaint is that the ALJ failed to adequately explain why
he found Dr. Mercurio's opinions not consistent with the other evidence in the

record.  The ALJ reasoned that the "minimal and conservative treatment records from [Pelliccia]'s own physicians since 2018" were not consistent with Dr. Mercurio's findings. *Admin. Tr.* at 701.  As Pelliccia points out, in support of that statement, the ALJ did not cite to the record.  Rather, the ALJ referred to treatment records "as noted above." *Id*.  But the ALJ did discuss Pelliccia's treatment records earlier in his decision. *Id*. at 22–24.  Further, in connection with the opinion evidence of Dr. Datta—which the ALJ also found not persuasive given Pelliccia's minimal and conservative treatment since his cervical surgery—and the opinion evidence of Dr. Rosenthal—which the ALJ found partially persuasive—the ALJ did cite to the record. *Id*. at 25–26; *see also Zaborowski*, 115 F.4th at 639 (concluding that the ALJ adequately articulated her reasoning where she "weave[d] supportability and consistency throughout her analysis of which doctors were persuasive").  In sum, when read as a whole, the ALJ adequately explained why he found Dr. Mercurio's opinions only partially persuasive, and the ALJ's decision is supported by substantial evidence, including the opinion of Dr. Rosenthal.

Pelliccia also points to evidence that he contends supports Dr. Mercurio's opinions. *See doc. 15* at 7.[10]  But, as set forth above, reading the ALJ's decision as

---

[10] In this regard, Pelliccia points to a February 2017 x-ray, a March 2017 MRI, and August 2022 x-rays. *Doc. 15* at 7.  Although the ALJ did not discuss the February 2017 x-ray, he did discuss the March 2017 MRI and an examination that noted the findings from the August 2022 x-rays. *Admin. Tr.* at 23, 24, 25.  "There is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence

a whole, the ALJ considered Pelliccia's contentions, his treatment records, and the opinion evidence, and the ALJ  reasonably explained why he found Dr. Mercurio's opinions only partially persuasive.  While Pelliccia contends that there is objective evidence that supports Dr. Mercurio's findings—and this may be so—to the extent he is suggesting that the court accept his analysis of the evidence over the analysis set forth by the ALJ, we cannot reweigh the evidence. *Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (citation omitted)).  And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).  Here, the ALJ fulfilled his duty in evaluating the evidence and explaining why he chose to credit some evidence over other evidence.

---

included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). And given that the March 2017 MRI was performed after the February x-ray and both were of the cervical spine, *see Admin. Tr.* at 709–711 (diagnostic report of MRI of the cervical spine), 720 (discussion of neck x-ray), the failure of the ALJ to specifically address the February 2017 x-ray is unremarkable.

## VI.  Conclusion.

For the foregoing reasons, we will affirm the decision of the Commissioner.

An appropriate order follows.


___***S/Susan E. Schwab***___
Susan E. Schwab
United States Magistrate Judge